Yes, sir. Thank you, Your Honor. Both Judge Boyle and Ms. Bennett herself recognize that this case turns entirely on the sufficiency of the evidence that the vandalism of Ms. Bennett's car was perpetrated by one of her supervisors. There was no evidence of that. Ms. Bennett asserts that the mere fact that there was some friction with trainmasters Gilbert and Howes earlier in the week is, quote, circumstantial evidence that one of them must have been the perpetrator. But this court made clear in Gibson and Lovelace that merely mouthing the bromide that circumstantial evidence should be treated the same as direct evidence is not enough. The question in any case, Your Honors, is whether the inference that the party, with the burden of proof, seeks to draw from the evidence is reasonably probable, which is sufficient, or instead only merely possible, which is not sufficient. As this court explained in Lovelace, and let me say that if there is one case that I urge you to read for purposes of resolving this one, Lovelace would be it. Which case, sir? Lovelace. That's a, I think it's a 1982 decision, but you cited it more recently in your decision in Gibson, Your Honor. But that case has a very long treatment of how you tell the difference between circumstantial evidence that's sufficient and circumstantial evidence that's insufficient. And the point that the court made there is that if you rely on mere possibility, if a jury is asked to choose between mere possibilities, then it ultimately has to fall back on speculation, sympathy, and other improper considerations. And that's why you have to draw the line between reasonably probable. And here all we had was mere possibilities. In the words of this court, it was sheer speculation that either Howes or Gilbert, even Miss Bennett doesn't say which one, was the culprit here. Now this is not a case in which all or virtually all of the other possible culprits were excluded by this circumstantial evidence. Let me explain to you why that's so. First, the undisputed evidence is that the parking lot was open to the public and that Miss Bennett parked her car at a remote area of the lot where it could not be seen from the watchtower. James Bradley, who is a CSX van driver, reported the day after the incident that he observed a silver Dodge Charger that he had never seen before parked very close to Miss Bennett's car shortly before the vandalism occurred. Now there was evidence that Miss Bennett was recently divorced from her husband, which makes him at least as plausible suspect as either of the two men that she had only had one experience with earlier in the week. It's also undisputed that Miss Bennett placed two phone calls to the same number at 1.30 and 3.30 in the morning, yet she amazingly insisted that she did not recognize the number and could not call who she might have been calling at those unusual hours. It's also undisputed that Miss Bennett had already started consulting with lawyers immediately after her friction with Mr. Howes on August 22, which was three days before the vandalism. Now the inference that she orchestrated the vandalism is no less strong than the inference that either Gilbert or Howes did it, and that's even disregarding the other incidents evidence which we'll talk about in a minute. Finally, the spelling of the n-word on is a spelling used in the hip-hop culture, which is predominantly an African-American art form. It is not generally used as a racial slur, so the spelling itself makes it more likely that the perpetrator was either African-American or at least someone who is familiar with hip-hop slang, and that's a far more likely inference than that the vandalism was committed by these middle-aged Caucasian men from rural North Carolina. Now I'm not saying that you have to say one or the other. My point is simply that all we have here is a choice among multiple speculative possibilities, and under Gibson and Lovelace, that's not sufficient. Now let me turn to the second issue which I adverted to earlier, which is the other incidents evidence. Can I ask you a question about the recent Supreme Court decision in Vance? Yes, Your Honor. For some reason it wasn't discussed at all, and I'm wondering what application you think Vance has that deals with when a crime, when a legal violation can be imputed to the employer. Yes, Your Honor. And it deals with supervisory status. Now it says to some extent, as I recall it, it wasn't briefed to my surprise, but maybe there's a reason it wasn't. In order, does it stand for the proposition that in order to impute wrongdoing to the employer, the so-called supervisors have to have the ability to hire and fire? And with respect to Hauser and Gilbert, did either one of those have the ability to hire or fire? Okay, to start with, neither of them would be a supervisor under Vance. They did not have the authority to take any of the tangible job actions that the Supreme Court cataloged in Vance. But wouldn't we have to remand the case to the district court to make that determination, if we wanted to go there? If you wanted to go there, I believe that this issue I just discussed is a threshold issue that would enable you to resolve the case without the need for a remand, because if you conclude there was insufficient evidence that either of them did it, it sort of moots the point whether they are supervisors. But shouldn't, and the district court didn't have the chance to consider the applicability of the Vance decision to these particular facts? That's correct, because Vance was not decided until after. To sort of give you the procedural history, this court adopted a different rule in the Witten versus Fred's case. So the case was tried under the assumption that these guys were supervisors, which was true under the Witten case. In our opening brief, we brought to this court's attention in a footnote the pendency of Vance. And then, by the time we got to the reply brief, Vance had been decided. And we pointed out again in the reply brief that they're not supervisors under Vance. Does that, whether they are supervisors or not, is that a factual inquiry under Vance to some extent? You would have to explore the relationship between and what the formal or informal authority that Hauser or Gilbert exercised? Well, in a sense that you could have a summary judgment record. A judge could resolve it as a matter of law based on undisputed facts about what their authority was. So there would be additional, if it were remanded, there would be additional facts that we could put in the record. What we have in the record is Hauser's testimony, that it was way above his pay grade to tell Ms. Bennett. The record hasn't been developed on that point. Correct. On the Vance point. That's correct. But is there any reason of, I don't, do you think Vance is applicable here? Well, it's a question of whether the court will excuse our failure in the district court to say they're not supervisors under a rule that doesn't apply in this circuit. Because at the time, we were bound by the Witten case. But if you had the Vance decision, presumably you would have put that in the record, wouldn't you? Absolutely. And the case would be over. I'm just wondering, you know, we've got a Supreme Court decision that may be on point and the record hadn't been developed with respect to it. You know, I don't want to... Well, I mean, that's certainly a way to resolve the case. I would prefer you resolve it on the basis of Lovelace and Gibson and say, regardless of whether they were supervisors, there's no sufficient evidence that they did this. And because otherwise, we're going to have to go through this whole thing again. And if Judge Boyle rejects our argument on that, we've got to come right back to you here with all of the same points that are in the brief. So, you know, if we're not going to win on the first argument, then that comes next. But if you agree with us about Gibson and Lovelace being dispositive here, then I would urge you to resolve it on that basis. I see that I'm going to quickly run out of the time before my rebuttal. Are there other... Among our other three issues, are there any in particular you'd like me to address or should I just pick my favorites? Could you address the front pay and back pay issue? Yes, Your Honor. Let me say this. I think we didn't do the most clear job in our brief of explaining the threshold question of why they were required to prove constructive discharge. The simple answer to that, which Your Honor already said in a footnote in the Johnson case, is that to obtain front or back pay, an employee must obtain a finding that the action against her. Often... But if we disagree with you on that, wouldn't the front pay, I mean, here it's 27 years in advance, you know, on the assumption that somebody is, number one, going to stay in that job for 27 years, and number two, that if she's not staying in the job, that she's not going to be earning anything that should be deducted from the front pay award? And is there any case that's awarded front pay 27 years out? Well, I believe they cite a smattering of cases that involve longer, long durations of front pay, but we've tried to distinguish them in our brief. Many of them, the people, the court had a finding that they'd be unemployable for one reason or another. But I really would like to engage on the threshold question of why they have to prove constructive discharge, because I think that would cut it right off. And that is that generally you have to prove some adverse job decision, and that could be a discriminatory termination, transfer, demotion, failure to promote, or failure to hire. That's what all of the other Fourth Circuit cases involved. If the jury finds any of those kinds of tangible adverse employment actions, then the court can award back and front pay subject to the duty to mitigate, which is when that gets taken into account. But if the employer took no affirmative adverse action, which is the case here, we didn't terminate her. We invited her back to work. And the employee's claim instead is that she was subjected to a hostile environment. She has to prove that she was constructively discharged because that is the functional equivalent of a tangible adverse action. And that's what you said in that footnote in Johnson. And it reconciles all of the Fourth Circuit cases, and it creates consistency with the eight other circuits that we cited. So the requirement of that constructive discharge is, I think, a central failing of their case here, because they did not request a finding, they did not receive one, and they could not receive one as a matter of law after the fact. So the Supreme Court in Pennsylvania State… Would the constructive discharge issue affect the $150,000 jury award? No. They're separate. They are separate. That the jury can do, and that is exactly what the remedy is for a hostile environment. What the constructive discharge thing does is it speaks to the award of front and back pay. That's exactly right. You need, as a prerequisite to that remedy, some tangible, some affirmative action on the part of the employer. And it could be a tangible action like the ones I identified, or it could be a constructive discharge, but it's got to be something. Suppose Hauser was the one that did vandalize the car. Would that be a constructive discharge? No, because the Supreme Court said in Pennsylvania State Police v. Suitors that the standard for constructive discharge is higher than the standard for hostile environment. And you would have to actually go to a jury and ask it, did the employer… Was the environment at the employer so intolerable that a reasonable person would feel compelled to resign? And that's a fact question for the jury. It is a more, it's a more onerous standard than the standard for mere hostile environment. And in this case, there was plenty of evidence from which a jury could find, no, it was not so intolerable that a person, a reasonable person, it's not a subjective test, it's a reasonable person, would feel compelled to resign, notwithstanding the fact that they twice invited her back to work. They put her in touch with the employee assistance program. They testified that they would have been willing to try to get her to work at a different yard if she was concerned about working at the Rocky Mountain Yard. So with all of that evidence, there is no way you could sort of after the fact say, well, no jury could reasonably conclude other than that there was a constructive discharge. Shall I… You've got some time reserved for a reply. Let's hear from Mr. McLeod. Thank you, Your Honor. May it please the Court and its members, I'll address first the Title VII verdict and then the front pay award if it pleases the Court. With regard to the arguments made today, each one of those arguments were made first to the jury and rejected by the jury. And they were also made to Judge Boyle in the Railroad's post-trial motions and were rejected by Judge Boyle. And I can tell you, having tried the case, there was an inordinate amount of evidence that pointed to Howes and Gilbert. For example, the day that Ms. Bennett arrived to work in the Fayetteville Yard, which was approximately one week prior to the vandalism, Mr. Howes had been written up by other members of management at CSX for having a hat in his office that was implicated with the KKK. When management asked him to remove that hat, his response was, okay, I'll remove it. And P.S., this was in the email, I'll also remove my Thomas Jefferson memorabilia because he fathered a child with an African-American slave while he was writing the Constitution. After the same day that email was sent, he had interactions with Ms. Bennett, and he concluded that day, and to quote him, get off my railroad. You're not to work on my railroad anymore. And not only did he tell Ms. Bennett that, he reduced that to writing and told other members of CSX management that in an email. And he told Ms. Bennett that at a time when he had never seen her perform any jobs that would be indicative of her responsibilities as a conductor. You take that and you couple that with Mr. Gilbert. Did you really need Dr. Darity or whoever it was as an expert witness? I read his testimony. He's talking about microaggressions and macroaggressions. I mean, who do you need an expert for to talk about that? All it refers to is minor acts or relatively minor acts and relatively major acts. What is all that about micro and macroaggressions and that concept? It throws jargon into something that the jury can exercise common sense about. And I appreciate that question. First off, if the subject matter was so easily understood, then there would be no prejudice in Dr. Darity testifying. Dr. Darity graduated from Brown University from MIT. He was a director of the African American Studies at the University of North Carolina at Chapel Hill and is a professor emeritus at Duke University. What he was able to do was he was able to share with the jury how discrimination in the workplace affects a person's ability to perform his or her job. And what he shared with the jury, which I personally enjoyed the testimony, was that even if you are- I haven't seen many of these hostile environment cases where there have been experts come on with respect to these hostile environment cases. Most of them don't. Your Honor, CSX had an expert on this issue in the case. He was there in the courtroom. They elected for whatever reason not to call him during their case in chief. Their initial criticism of Dr. Darity, Your Honor, was that in the field of social sciences, it would require Dr. Darity to weigh competing testimony in a he-said-she-said type environment and therefore that testimony would be unreliable. At trial, I asked Dr. Darity the following question. Dr. Darity, if you would please, sir, take a whiteout. This is a figurative question, of course. Take a whiteout and delete every single thing that Vicki Bennett has ever said about any of these events. Do you still arrive at the same opinion? And, of course, his answer was yes because he could look at the interaction just based on Howes and Gilbert. And he was able to demonstrate to the jury how they created barriers of entry, which has been studied for many, many years, causing problems in the workplace. And going back to Howes and Gilbert, it's almost difficult for me to imagine that they can argue there was no evidence that Howes and Gilbert were responsible for the vandalism. For one, they argued that they did. Mr. Milburn, who's in the courtroom today, he stood in front of the jury and he said, ladies and gentlemen, if you don't find that Howes or Gilbert did it, then you're fined for the railroad. We win. The jury rejected that argument. The jury was charged specifically by Judge Boyle, begins on page 798 of the trial transcript, that the conduct that is complained of has to have been from the employer. And one thing, remind this, the black Chevy Avalanche that was vandalized, Mr. Gilbert had the exact same car. So the vandal had to know one, not only that Vicki Bennett drove a black Chevy Avalanche, but had to know which one she drove. Secondly, the vandal had to know to bring white paint because, after all, most people that do graffiti bring black paint. So they had to have known that she had a black car. Thirdly, the vandal would have done this vandalism, contrary to what they just argued to the court, under the plain view of the tower at the Rocky Mount yard. It's just like in an air traffic control center in an airport. Literally, there's their eyes in the sky with stadium lighting. And all the testimony at trial was, was that the car was plainly visible at the time the vandalism was made. In addition, when the Rocky Mount Police Department came to the scene of the crime, there was no mannequin head in the back of the car. After the Rocky Mount Police Department left, the mannequin head with a noose around its neck was in the car. Is that statement that you just made based on the fact it wasn't in the police report, or there was their testimony it was not there? There was testimony. And the point there is that the vandal would have to be so comfortable with the crime scene that they would literally commit the initial vandalism. I guess the opposing counsel said, well, this car was not visible to the front, to the CSX office. And so it would have been a, it was parked by itself out of view of the CSX office. And so it would have been a, you know, a target for random violence. That argument, with all due respect, is absolutely contrary to all the facts and evidence in the case, Your Honor. It truly is. And going one step further, as I shared with the jury, people don't cover up crimes that they don't commit. And in this case, there was undisputed evidence. James Bradley, before coming to work at CSX, worked at McDonald's. And he took a job as a clerk, which is the lowest rung of the totem pole at CSX. And basically what he does is he drives a Suburban and he takes the engineers and conductors from the yard office to the train. Mr. Bradley gave a written statement the night of the incident, as did everybody else that worked at the yard. In that statement, he didn't mention seeing anyone at the crime scene, much less an African-American male. CSX police interviewed James Bradley after the night of the incident and specifically put in their report Mr. Bradley denies seeing anybody at the scene. Now, despite that, I took his deposition some, probably a year after his statement was made, and he shared with me for the first time that he saw an African-American man next to Vicki Bennett's car. And I asked him, well, what are you doing now? And he said, well, I'm actually not working. And I said, what do you mean I'm not working? He said, well, I've got an FELA claim. And I asked him, I said, well, let me guess, and this was all in the trial transcript, your adjuster is the same adjuster as Vicki Bennett. And he said, yes. And to my shock and dismay, what I learned was about four months prior to me taking his deposition, he began receiving direct deposits in the amount of his full paycheck from CSX. The only condition was that he had to sign a form telling Mr. Watford, who was Vicki Bennett's claims adjuster, that he hadn't hired a lawyer. And so I asked him, and we showed it through trial, where did this injury happen? Well, it turns out, and I'm not making this up, it turns out that a year before he began receiving payments, he said that he was in a car accident driving that same very Chevy Suburban. CSX did an accident investigation and concluded that Mr. Bradley was lying. It actually didn't happen. And if it did happen, it meant that he wasn't hurt. But nonetheless, on the eve of his deposition in this case, he begins receiving payments for his full salary. Now, I shared with the ladies and gentlemen of the jury, guess how much, and this is in the record, the property damage bill was for the car wreck Mr. Bradley says he was in? $10. The total parts bill was $10. And so at his deposition, what I learned was the cover-up had been exposed. And I argued that in front of the jury, and I said, you know, I didn't get a chance to re-depose him, but I knew that the payout, the lump sum couldn't happen now because he had been exposed. So when he gets on the stand at trial, I say, well, Mr. Bradley, can you share with me what you're doing now? Well, he went from having a back injury and getting these payments to now he was a trainee for a management position at the railroad. The highest rung on the ladder for this particular railroad yard. And not coincidentally, he testified that he was in training. And what I was then able to argue to the jury was, was you see, if he had been given the full benefits of that job, they would have no control over him and no control over his testimony. But because he was still in training for this management job, they could cut him loose if they didn't like his trial testimony. And going back to the actual vandalism, I hope this is not lost, you know, in all of this, but the words on Vicky's car were as clear and unambiguous as they could have been. And they were the same exact words that Gilbert and Howes had already reduced to writing before the vandalism. One is stay off the railroad. Well, if it was a vandal, why would they care about Vicky Bennett working on the railroad? This Rocky Mount yard was 50 miles from her home. Nobody even knew she was working there that night. And why would a vandal, some random person, care if she worked on the railroad? Secondly, the communication was, you're stupid. Which is exactly what Mr. Howes told Vicky because she couldn't understand simple directions to the Fayetteville yard. Which was the exact same thing that James Gilbert had reduced to writing that in his words, I don't want to misquote this, I don't know if she can get with the program. And then the third part of the communication was they called her racial epitaph, which speaks for itself. And the problem with this case and with the PTSD that Vicky suffered was they went a step further and said if you do come back we're going to kill you. I mean that is the message that a mannequin with a noose around its neck conveys. And we can examine all the Title VII cases we want to, that threat is very real to an African American woman who works as a conductor on a railroad. And that was one thing getting to the front pay award that Judge Boyle considered. This is not a circumstance where there's water cooler talk where she can simply move to another part of the plant or the mill to do her job. In order for Vicky to do her job as a conductor she has to get on the train in the middle of the night sometimes and work with other men. The jury award here was $150,000 and then the I guess back in front pay award was $592,000 plus something. And both back pay and front pay are subject to a rule of mitigation. And at the time of the hearing on the front pay award it was clear that the plaintiff was Ms. Bennett was was running the three businesses or working on the three businesses and why was there was that not taken into account in terms of mitigation? Because that the problem that I have with the front pay award is I've almost never seen one that stretched 27 years into the future. And particularly with somebody who had been on the job four months a lot of that was spent in training and you have an employee who's been on the job four months and then there's 27 years of front pay and at the time of the hearing she's running three businesses and so the district court says well she would have worked with CSX 27 years and she would never work again I mean uphold this would make us a real outlier just in terms of the numbers I don't have the difficulty with the jury's damage award but here we have a back pay award that's four times a front pay award which is four times the damage award and just wonder whether things didn't get a little out of control there whether that wasn't just very speculative and with respect to the back pay award I didn't understand why they didn't reduce the back pay award for the earnings in 2011 or 2012 they were reduced for the years 2009, 2010 but I didn't see that they were reduced for 2011 2012 and there were 44 months of back pay awarded when the plaintiff's training cohort was furloughed without pay for 20 of those months um so you know the front pay and the back pay awards are subject to some rule of mitigation and it looked like the district court just went wild I mean I know there was who was the expert Dr. Woods or something but that was just really speculative when somebody's actually working in three businesses and I want to address that your honor first off if this court affirms Judge Boyle's ruling with regard to the front and the back pay it will not make this court an outlier we've cited in our brief on page 52 where other circuits have awarded a longer duration of front pay and a larger amount of money on front pay what this court is asked to do is to review the record to determine whether or not Judge Boyle abused his discretion in awarding the damages that he did and with all due respect to CSX they don't like their front pay award but what they haven't done is argued to this court facts which show that Judge Boyle abused discretion but what I want to know is was it evident at the time of the hearing on the front pay whether the um the plaintiff was actually working in three different businesses this is what the evidence is in this case your honor first off answer that question she had earned W-2 income that was that was reduced from the back pay award in 2000 I'm talking about the front pay award the front pay award was entered on the basis that she would never work again that's not correct your honor well that I can't find that it was that it was reduced at all or that the judge made much of an effort to reduce these very large vastly exceeded the amount of the jury award and compensatory damages the judge takes his equitable powers and seems to me to um just not take into account mitigating factors sufficiently with respect to the back pay award it didn't take into account the earnings from 2009 to 2000 or the earnings in 2011 to 2012 or the fact that the plaintiff whole class was furloughed for 20 months for which he awarded back pay and then we go 27 years into the future in the face of evidence that in the present the plaintiff was deriving income from three different businesses and it's almost like district court says well these front pay and back pay awards aren't really subject to any rule of mitigation I'm going to speculate you know go sky high I respectfully disagree for one this case is very different than often cases that are tried in this case it was undisputed at the time of trial by their own expert that Vicky Bennett could not return to that job and perform the normal functions on a day to day job so that's one number two CSX wrote Ms. Bennett and said if you don't come back to work then turn in your radio and everything else and those facts your honor are actually almost identical to the facts of the Pollard case which to my knowledge is the last time the US Supreme Court looked at the front pay situation at the trial court in Pollard what the judge did was he awarded a significant amount of money damages and in doing so he noted that she suffered from and that they had taken they had asked her to return to the same hostile work environment that had never been corrected and therefore the court awarded those damages and that's exactly what happened here it's the amount when you start going that far out you know the longest any other CSX employee testified to was about 10 years and here this is 27 well you know the longest CSX employee had remained as a conductor or whatever the testimony was 10 years if the award had been 10 years and had been key to that kind of testimony and said this is a realistic time but you know just saying well I'm sure you'll be working 27 years anyway my button says stop I do want to respond but I don't want to belabor the point if I'm let me just ask you one quick question I must not have been clear on the question I ask and this is a minor point but my question was about this head and the noose and whether or not that was based on the absence of the report I'm looking at page 21 of your brief and you say the police department conducted an investigation made no mention of seeing the mannequin head and somebody else working CSX saw it at 11 in the morning and from that you conclude that whoever did this left and the police came and then these people came back and put the mannequin head and the noose in the car after all of this had been discovered. The reason for it that those facts demonstrate is that the vandals were very comfortable with the crime scene so comfortable that after law enforcement left. But they did come back you're arguing they did come back after all of this had been going on and put some more stuff in the car. That's correct your honor alright thank you we'll come down excuse me I'm sorry there's a reply argument sorry about that there were a lot of points that weren't responses. Let me start with your point Chief Judge Traxler page J A or page 765 of the J A is the testimony of Scott Zipko who said he saw the mannequin head at about 430 in the morning in the back of the car when he found the paint can or spray paint another inaccuracy is the statement that it's undisputed by us that Ms. Bennett couldn't return to the job and based on an expert that didn't testify and I read that you know we're out of the record now because they're relying on out of the record stuff but he never said that and in fact their expert said Ms. Bennett was on the fringe of the workplace that she would imminently be able to return to work so that is just inaccurate now going back to the actual argument about the sufficiency of the evidence I think it's very interesting that opposing counsel has again mixed and matched back and forth between Howe's hat and Gilbert's car being recognizable and Gilbert having the opportunity Howe's having the motive that's exactly the point this is all just rank speculation and the speculation requires apparently that you believe that Bradley perjured himself because and not just perjured himself but filled out a false report based on something that happened a year or so after he wrote the report because bear in mind the report the day after the accident said I saw this vehicle parked close to hers I've never seen it before there were no other cars near it so that is evidence that somebody was up to no good next to her car whether you believe that there was a person there or not that testimony is unimpeachable If this case were remanded I'm concerned about not applying a Supreme Court decision that may be on point and if this case were remanded and were going to be reviewed in the light of Vance what evidence would you introduce in the record Well there would be testimony from the appropriate person at CSX about what the what authority the train masters have to undertake any of the tangible job actions that the Supreme Court identified in Vance and the testimony would be they don't have that authority the most they could do is make a recommendation but as House himself has already testified it's way above his pay grade to do any of those things so that's what it would be we'd have the right person come in and do it and I think it would be undisputed I mean it's pretty clear whose authority is what in a corporation like ours so that's how it play out but you know we'd be how would it work if he disagrees with us do we come back with the rest of the issues are you going to decide those in an advisory capacity first there's a lot there's a lot to address in addition to Vance sure but I mean you know I'm just I'm just uneasy about letting a recent Supreme Court case just and an important one just not you know not just ignoring it and pretending it's not there or something like that it just it makes me uncomfortable well understood and to me a victory is a victory I'm not going to tell you not to give it to us so can I make one more point about I don't think you know I don't think you I don't fault the district court he didn't have the benefit of the decision you didn't have the benefit of the decision the other folks didn't have the benefit that's correct can I make one point about Darity since you had asked about it I agree with all the points you made I just want to make one additional related point about Darity oh yeah okay the point is this the central piece of testimony he gave that's relevant to the outcome here is that this was a hostile environment that is basically Ipsa Dixit of an expert the Supreme Court has said over and over again that that kind of testimony should not be admitted whether it's rule 702, 703 or 403 and I would direct you to the MacGyver decision U.S. vs. MacGyver which you are on the panel I believe Judge Duncan wrote that talks about when courts are not when experts are not allowed to give juries sort of legal terms that have legal definitions when they're not allowed to opine on them and I submit to you that this falls squarely within the prohibited part of that how important was this expert well you know as this court and other courts say you know the expert is cloaked with authority as he mentioned he's got great credentials so it's very important it's vouching it's basically doing the job of a lawyer he's coming in there and he's giving lawyers argument but he's so I would say it's absolutely important and critical that this court prohibit that kind of testimony thank you your honors I will come down and greet counsel and then go into our last case
judges: William B. Traxler Jr., J. Harvie Wilkinson III, Henry F. Floyd